**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-_____

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

     Plaintiff,

v.

**JBS CARRIERS, INC.,**

     Defendant.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

**NATURE OF THE ACTION**

     This is an action under Title I of the Americans with Disabilities Act of 1990 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Charging Party Cindy Divine and other aggrieved individuals who were subjected to discriminatory practices on the basis of their disability or perceived disability by Defendant JBS Carriers, Inc. ("JBS Carriers"). As alleged with greater particularity below, the Equal Employment Opportunity Commission ("EEOC") alleges that JBS Carriers engaged in unlawful conduct when it utilized post-offer, pre-employment screening that has the effect of discrimination on the basis of disability and screens out or tends to screen out individuals with disabilities. The EEOC also alleges JBS Carriers improperly used medical information obtained from the post-offer screen to discriminate against individuals on the basis of disability. The EEOC further alleges that JBS Carriers failed to hire Cindy Divine and other

1

aggrieved individuals based on disability and failed to accommodate certain aggrieved individuals.

At all relevant times, JBS Carriers contracted with a non-party, ErgoMed, Inc. ("ErgoMed"). ErgoMed administered the post-offer screen that subjects all applicants to an overly invasive medical history questionnaire, a physical examination, and physical abilities testing. At the beginning of this process, ErgoMed learns whether an applicant has ever been under any physical restrictions or has had any medical impairments. ErgoMed also conducts a physical examination of the applicants, including range of motion and strength testing. Finally, ErgoMed subjects applicants to physical abilities testing, which includes nine tests of fitness, agility, lifting, pushing, and pulling. If an employee fails any one of the nine physical abilities tests, or is not allowed to take the tests because of performance during the physical examination or information provided in the medical history questionnaire, ErgoMed submits a "No Job Match" recommendation to JBS Carriers that the applicant should not be hired. JBS Carriers follows this recommendation without consulting with the applicant or engaging in the interactive process.

Throughout the post-offer screening process, JBS Carriers unlawfully utilizes medical information, uses discriminatory qualification standards, screens out individuals with disabilities, fails to hire individuals because of their disabilities (as defined in the ADA), and fails to accommodate certain qualified individuals with disabilities. The EEOC alleges that JBS Carriers's conduct during the post-offer screening process discriminated against Charing Party Cindy Divine and other aggrieved individuals, and also constitutes a pattern or practice of discrimination.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e-5(f)(1) and (3) and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3.      Plaintiff EEOC is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title I of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1).

4.      At all relevant times, JBS Carriers, a Delaware corporation, has continuously been doing business in the State of Colorado and the City of Greeley and has continuously had at least 15 employees.

5.      At all relevant times, JBS Carriers has continuously been an employer engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C. §§ 12111(5), (7).

6.      At all relevant times, JBS Carriers has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

7.     JBS Carriers represents itself to the public as "the transportation arm of JBS USA."  JBS USA is a corporate affiliate of JBS Carriers, which represents itself publicly as "a leading processor of beef, pork and lamb in the U.S.," as well as "the largest cattle feeder in the world."

8.     JBS Carriers represents itself to the public as a multi-state and regional truckload carrier with regional operations in the Midwest and Western states and as offering carrier services to customers throughout the United States.

9.     JBS Carriers has terminal facilities in Greeley, Colorado; Green Bay, Wisconsin; Hyrum, Utah; Cactus, Texas; Pittsburg, Texas; and Oakwood, Georgia.

10.    Since at least on or about March 5, 2012, JBS Carriers has engaged in unlawful employment practices, including at its Greeley facility in violation of the ADA.

11.    On information and belief, these practices are continuous and ongoing.

## GENERAL ALLEGATIONS

### I.     Conditions Precedent

12.    More than 30 days prior to the institution of this lawsuit, Charging Party Cindy Divine ("Divine") filed a charge of discrimination with the EEOC alleging violations of the ADA by JBS Carriers.

13.    The EEOC provided JBS Carriers with notice of the charge of discrimination.

14.    The EEOC investigated the charge of discrimination.

15.    Based on evidence obtained during the investigation, on October 13, 2016, the EEOC issued a determination finding reasonable cause to believe that JBS

Carriers engaged in certain unlawful employment practices identified in the determination.

16.     The EEOC's determination included an invitation for JBS Carriers to join the EEOC in informal methods of conciliation in an attempt to eliminate the alleged unlawful employment practices.

17.     JBS Carriers agreed to participate with the EEOC in this informal conciliation process.

18.     On September 19, 2017, the EEOC issued a Notice of Failure of Conciliation advising JBS Carriers that the EEOC was unable to secure from JBS Carriers a conciliation agreement acceptable to the EEOC.

19.     All conditions precedent to this lawsuit have been satisfied.

**II.     Charging Party Cindy Divine**

20.     On or about March 5, 2012, JBS Carriers extended Divine a conditional job offer as a truck driver.

21.     At that time, Divine had over 30 years of commercial truck driving experience.

22.     The conditional job offer extended to Divine reflected JBS Carriers's conclusion that Divine was qualified for the position to which she had applied.

23.     As a prerequisite to employment, JBS Carriers required Divine to undergo pre-employment screening administered by ErgoMed.

24.     ErgoMed refers to this screening as a "Post Offer Screen."

25.     On or about March 11, 2012, Divine traveled from her home near Lake Elsinore, California to Greeley, Colorado to complete the post-offer screen.

26.     As part of her travels, Divine had to carry heavy luggage from the bus stop to her motel, which made her shoulders sore.

27.     On or about March 12, 2012, Divine went to Greeley to complete the post-offer screen.

28.     At the beginning of the post-offer screen, Divine completed a medical history questionnaire.

29.     Divine also completed a workers' compensation history questionnaire.

30.     After completing the questionnaires, Divine proceeded to the physical examination portion of the post-offer screen.

31.     During the physical examination, ErgoMed concluded that Divine had "positive shoulder tests with questionable cuff integrity."

32.     Divine told ErgoMed that she did not have any problems with her shoulders, but was sore from carrying the heavy luggage from the bus stop to the motel.

33.     Nevertheless, ErgoMed stopped the screen and Divine was not allowed to complete the physical abilities testing.

34.     ErgoMed did not discuss with Divine whether she needed accommodation to complete the post-offer screen.

35.     ErgoMed sent JBS Carriers a "No Match" recommendation for Divine.

36.     ErgoMed also sent JBS Carriers a "Post Offer Screen/Fit for Duty" report for Divine.

37.     The report included ErgoMed's conclusion that Divine had "questionable cuff integrity."

38.     JBS Carriers withdrew its conditional job offer to Divine.

39.     JBS Carriers did not hire Divine.

40.     JBS Carriers did not hire Divine based on the fact that she was unable to complete the post-offer screen.

41.     JBS Carriers did not hire Divine based on ErgoMed's "No Job Match" recommendation.

42.     JBS Carriers did not discuss with Divine whether she needed reasonable accommodation to complete the post-offer screen.

43.     JBS Carriers did not discuss with Divine whether she was able to perform the essential functions of the truck driving position, with or without reasonable accommodation.

44.     JBS Carriers did not make an individualized assessment as to whether Divine needed reasonable accommodation to complete the post-offer screen.

45.     JBS Carriers did not make an individualized assessment as to whether Divine could perform the essential functions of the truck driving position, with or without reasonable accommodation.

**III.     JBS Carriers's Use of ErgoMed's Post-Offer Screen**

46.     Beginning no later than March 2012, JBS Carriers has had a contractual relationship with ErgoMed.

47.     In this contractual relationship, JBS Carriers authorized ErgoMed to conduct post-offer screens on applicants for employment with JBS Carriers.

48.     In this contractual relationship, ErgoMed serves as JBS Carriers's agent for purposes of conducting the post-offer screens.

49.     On information and belief, JBS Carriers negotiated the terms of its contractual relationship with ErgoMed.

50.     On information and belief, JBS Carriers periodically renegotiated the terms of its contractual relationship with ErgoMed or had the opportunity to do so.

51.     On information and belief, JBS Carriers could have negotiated with ErgoMed to provide different post-offer screening services or for ErgoMed to report its findings and recommendations to JBS Carriers in a different manner.

52.     JBS Carriers could hire any job applicant, regardless of ErgoMed's findings or recommendations.

53.     At all times, JBS Carriers could terminate its contractual relationship with ErgoMed.

54.     As of March 2012, ErgoMed administered the post-offer screen for JBS Carriers, as more specifically described in Paragraphs 55-136 below.

55.     JBS Carriers's and ErgoMed's post-offer screen included the following components: (1) a medical history questionnaire, (2) a physical examination, and (3) physical abilities testing.

### a. Medical History and Workers' Compensation History Questionnaires

56.     During the post-offer screen, applicants were required to fill out a medical history questionnaire with over 25 questions regarding their medical history.

57.     Applicants were also required to complete a workers' compensation history questionnaire.

58.     If an applicant's medical history questionnaire revealed the existence of a prior injury, impairment, surgery, restriction, or medical condition, ErgoMed required the

applicant to provide medical records or get a medical clearance from his or her physician to complete the screen.

59.     If an applicant's medical history questionnaire revealed the existence of a prior injury, impairment, surgery, restriction, or medical condition, ErgoMed would not allow the applicant to complete all portions of the post-offer screen, unless the applicant provided medical records and/or a physician's clearance that were satisfactory to ErgoMed.

60.     If ErgoMed did not permit an applicant to complete the post-offer screen, ErgoMed would send JBS Carriers a "No Job Match" recommendation.

61.     On information and belief, if an applicant's medical documentation revealed that he or she was restricted from lifting an amount between 0 and 90 pounds from floor to waist, ErgoMed would not allow the applicant to complete the post-offer screen.

62.     On information and belief, if an applicant's medical documentation revealed that he or she was restricted from lifting an amount between 0 and 60 pounds from waist to shoulder, ErgoMed would not allow the applicant to complete the post-offer screen.

63.     On information and belief, if an applicant's medical documentation revealed he or she was restricted from squatting, ErgoMed would not allow the applicant to complete the post-offer screen.

64.     On information and belief, if an applicant's medical documentation revealed he or she was restricted from crouching, ErgoMed would not allow the applicant to complete the post-offer screen.

65.     On information and belief, if an applicant's medical documentation revealed he or she was restricted from stepping 23 inches, ErgoMed would not allow the applicant to complete the post-offer screen.

66.     On information and belief, if an applicant's medical documentation revealed he or she was restricted from pulling an amount between 0 and 100 pounds horizontally, ErgoMed would not allow the applicant to complete the post-offer screen.

67.     On information and belief, if an applicant's medical information revealed he or she was restricted from pushing an amount between 0 and 80 pounds horizontally, ErgoMed would not allow the applicant to complete the post-offer screen.

### b. Physical Examination

68.     During the post-offer screen, each applicant was required to undergo a physical examination by ErgoMed staff.

69.     The physical examination was conducted by an ErgoMed employee.

70.     The physical examination was not conducted by a doctor.

71.     During the physical examination, ErgoMed: (1) measured the applicant's range of motion, and (2) performed strength and "specialty" tests on the applicant.

### i. Range of Motion Measurements

72.     During the physical examination, ErgoMed measured each applicant's range of motion.

73.     The range of motion portion of the physical examination included the following Active Range of Motion ("AROM") measurements: Shoulder AROM, Elbow AROM, Cervical AROM, Lumbar AROM, and Straight Leg Raise AROM.

74.     On information and belief, if any of an applicant's AROM measurements were outside the normal range of motion expressed in degrees, ErgoMed would not allow the applicant to complete the post-offer screen.

75.     On information and belief, if an applicant expressed substantial pain during any of the AROM measurements, ErgoMed would not allow the applicant to complete the post-offer screen.

76.     On information and belief, if an applicant expressed substantial difficulty in performing any of the AROM measurements, ErgoMed would not allow the applicant to complete the post-offer screen.

77.     On information and belief, if an applicant expressed moderate pain during any of the AROM measurements, ErgoMed would not allow the applicant to complete the post-offer screen.

78.     On information and belief, if an applicant expressed moderate difficulty in performing any of the AROM measurements, ErgoMed would not allow the applicant to complete the post-offer screen.

79.     On information and belief, if an applicant expressed pain during any of the AROM measurements, ErgoMed would not allow the applicant to complete the post-offer screen.

80.     On information and belief, if an applicant expressed difficulty in performing any of the AROM measurements, ErgoMed would not allow the applicant to complete the post-offer screen.

### ii.  Strength and Specialty Testing

81.     During the physical examination, ErgoMed performed strength and "specialty" tests on each applicant.

82.     The strength and "specialty" tests included the Empty Can Test, the Speeds Test, and the Neer's Test.

83.     On information and belief, if an applicant could not perform each strength or "specialty" test, ErgoMed would not allow the applicant to complete the post-offer screen.

84.     On information and belief, if the results of any one of an applicant's strength tests were outside normal limits, ErgoMed would not allow the applicant to complete the post-offer screen.

85.     On information and belief, if the results of any one of an applicant's "specialty" tests were outside normal limits, ErgoMed would not allow the applicant to complete the post-offer screen.

86.     If the results of any one of an applicant's strength tests were positive, ErgoMed would not allow the applicant to complete the post-offer screen.

87.     If the results of any one of an applicant's "specialty" tests were positive, ErgoMed would not allow the applicant to complete the post-offer screen.

88.     On information and belief, if an applicant expressed substantial pain during any of the strength tests, ErgoMed would not allow the applicant to complete the post-offer screen.

89.     On information and belief, if an applicant showed substantial weakness during any of the strength tests, ErgoMed would not allow the applicant to complete the post-offer screen.

90.     On information and belief, if an applicant expressed substantial pain during any of the "specialty" tests, ErgoMed would not allow the applicant to complete the post-offer screen.

91.     On information and belief, if an applicant showed substantial weakness during any of the "specialty" tests, ErgoMed would not allow the applicant to complete the post-offer screen.

92.     On information and belief, if an applicant expressed moderate pain during any of the strength tests, ErgoMed would not allow the applicant to complete the post-offer screen.

93.     On information and belief, if an applicant showed moderate weakness during any of the strength tests, ErgoMed would not allow the applicant to complete the post-offer screen.

94.     On information and belief, if an applicant expressed moderate pain during any of the "specialty" tests, ErgoMed would not allow the applicant to complete the post-offer screen.

95.     On information and belief, if an applicant showed moderate weakness during any of the "specialty" tests, ErgoMed would not allow the applicant to complete the post-offer screen.

96.     On information and belief, if an applicant expressed pain during any of the strength tests, ErgoMed would not allow the applicant to complete the post-offer screen.

97.     On information and belief, if an applicant showed weakness during any of the strength tests, ErgoMed would not allow the applicant to complete the post-offer screen.

98.     On information and belief, if an applicant expressed pain during any of the "specialty" tests, ErgoMed would not allow the applicant to complete the post-offer screen.

99.     On information and belief, if an applicant showed weakness during any of the "specialty" tests, ErgoMed would not allow the applicant to complete the post-offer screen.

100.    If an applicant did not complete any part of the physical examination, ErgoMed would send JBS Carriers a "No Job Match" recommendation.

101.    If ErgoMed decided at any point during the physical examination that an applicant could not "safely" complete the post-offer screen, or could not continue the examination for any other reason, then ErgoMed would send JBS Carriers a "No Job Match" recommendation.

### c. Physical Abilities Testing

102.    If an applicant completed the medical history and physical examination portions of the post-offer screen, ErgoMed then administered physical abilities testing to each applicant in order to complete the post-offer screen.

103.    The physical abilities testing included nine different tests.

104.    The nine different tests included: (1) a 12-inch step test, (2) a squats test, (3) a front carry test, (4) a sustained crouch test, (5) a 23-inch step/step test, (6) a floor

to waist lift test, (7) a waist to shoulder lift test, (8) a horizontal pull test, and (9) a horizontal push test.

105.     During the step test, an applicant must continuously step up and down on a 12-inch step for a period of one minute.

106.     During the squats test, an applicant must complete 10 squats.

107.     During the front carry test, an applicant must: (1) carry 30 pounds a distance of 40 feet one time, and (2) carry 60 pounds a distance of 40 feet two times.

108.     During the sustained crouch test, an applicant must crouch for 20 seconds two times.

109.     During the 23-inch step test, an applicant must step up and down on a 23-inch step three times.

110.     During the floor to waist test, an applicant must: (1) lift 30 pounds from floor to table to floor three times; (2) lift 60 pounds from floor to table to floor three times; and (3) lift 90 pounds from floor to table to floor three times.

111.     During the waist to shoulder test, an applicant must: (1) lift 20 pounds from table to 54-inch shelf to table three times; (2) lift 40 pounds from table to 54-inch shelf to table three times; and (3) lift 60 pounds from table to 54-inch shelf to table three times.

112.     During the horizontal pull test, an applicant must pull an average of 100 pounds over the course of three repetitions.

113.     During the horizontal push test, an applicant must push an average of 80 pounds over the course of three repetitions.

114.     During all nine tests, each applicant wears a heart rate monitor.

115.   If at any point during the physical abilities testing an applicant's heart rate exceeded 85% of his or her calculated maximum heart rate, based on age, ErgoMed would not allow the applicant to complete the remainder of the post-offer screen.

116.   If an applicant could not successfully complete any one of the nine tests, ErgoMed would not allow the applicant to complete the post-offer screen.

117.   If an applicant could not successfully complete any one of the nine tests, ErgoMed would send JBS Carriers a "No Job Match" recommendation.

118.   If an applicant could not successfully complete one or more of the nine tests, ErgoMed would send JBS Carriers a "No Job Match" recommendation.

### IV.   JBS Carriers's Reliance on ErgoMed's Post-Offer Screen

119.   At all relevant times, JBS Carriers relied on the post-offer screen administered by ErgoMed to decide whether to hire applicants in truck driving positions.

120.   Based on the results of the post-offer screen, including the applicant's medical history, the physical exam, and the physical abilities testing, ErgoMed made a recommendation to JBS Carriers on whether to hire the applicant.

121.   At all relevant times, JBS Carriers relied upon ErgoMed's recommendations to decide whether to hire applicants in the truck driving positions.

122.   ErgoMed's possible recommendations to JBS Carriers regarding any applicant included: (1) "Completed POS/Fit for Duty," (2) "Incomplete POS/Fit for Duty," and (3) "No Job Match Recommendation."

123.   If an applicant successfully completed each portion of the post-offer screen, ErgoMed sent JBS Carriers a "Completed POS/Fit for Duty" recommendation.

124. If an applicant did not provide ErgoMed with the required medical documentation, ErgoMed sent JBS Carriers an "Incomplete POS/Fit for Duty" notification.

125. If the applicant failed to successfully complete any other portion of the post-offer screen, ErgoMed sent JBS Carriers a "No Job Match" recommendation.

126. If ErgoMed did not allow the applicant to complete all portions of the post-offer screen, ErgoMed sent JBS Carriers an "No Job Match" recommendation.

127. ErgoMed also sent JBS Carriers "Post Offer Screen/Fit for Duty" reports on applicants.

128. The "Post Offer Screen/Fit for Duty" reports included a summary of each applicant's previous medical history, a summary the applicant's range of motion measurements, a summary of the results of the applicant's strength and specialty tests, a summary of the applicant's physical abilities testing, and a notation as to whether the applicant had a workers' compensation discrepancy.

129. If an applicant completed or attempted to complete the physical abilities testing, ErgoMed sent JBS Carriers the results of such testing.

130. JBS Carriers made its hiring decisions in reliance on ErgoMed's recommendations and reports.

131. At all relevant times, JBS Carriers withdrew its conditional job offers to applicants in every case where the applicant did not successfully complete every portion of the post-offer screening.

132. At all relevant times, JBS Carriers withdrew its conditional job offers to any applicant who received a "No Job Match" recommendation from ErgoMed.

133.    At all relevant times, JBS Carriers withdrew conditional job offers from any applicant who received an "Incomplete POS/Fit for Duty" recommendation from ErgoMed.

134.    At all relevant times, JBS Carriers did not hire applicants in every case where the applicant did not successfully complete every portion of the post-offer screening.

135.    At all relevant times, JBS Carriers did not hire any applicant who received a "No Job Match" recommendation from ErgoMed.

136.    At all relevant times, JBS Carriers did not hire any applicant who received an "Incomplete POS/Fit for Duty" recommendation from ErgoMed.

**V.      JBS Carriers's Continued Use of ErgoMed's Post-Offer Screen**

137.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers and ErgoMed used a post-offer screen that is substantially similar to the post-offer screen used in 2012 and described in greater detail in Paragraphs 55-136 above.

138.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers and ErgoMed used a medical history questionnaire during the post-offer screening process that is substantially similar to the medical history questionnaire used in 2012.

139.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers and ErgoMed used a physical examination during the post-offer screening process that is substantially similar to the physical examination used in 2012.

140.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers and ErgoMed used physical abilities testing during the post-offer screening process that was substantially similar to the physical abilities testing used in 2012.

141.    On information and belief, beginning no later than March 2012 and continuing through the present, ErgoMed has sent JBS Carriers a "No Job Match" recommendation for any applicant who did not complete any portion of the physical examination.

142.    On information and belief, beginning no later than March 2012 and continuing through the present, ErgoMed sent JBS Carriers a "No Job Match" recommendation for any applicant who ErgoMed did not permit to complete the post-offer screen.

143.    On information and belief, beginning no later than March 2012 and continuing through the present, ErgoMed sent JBS Carriers a "No Job Match" recommendation for any applicant who did not successfully complete one or more of the nine physical abilities tests.

144.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers has withdrawn its conditional job offers to applicants in every case where the applicant did not successfully complete each portion of the post-offer screening.

145.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers has withdrawn its conditional job offers to

any applicant who received a "Incomplete POS/Fit for Duty" recommendation from ErgoMed.

146.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers has withdrawn its conditional job offers to any applicant who received a "No Job Match Recommendation" from ErgoMed.

147.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers has not hired any applicant when the applicant did not successfully complete each portion of the post-offer screening.

148.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers has not hired any applicant who received a "Incomplete POS/Fit for Duty" recommendation from ErgoMed.

149.    On information and belief, beginning no later than March 2012 and continuing through the present, JBS Carriers has not hired any applicant who received a "No Job Match Recommendation" from ErgoMed.

## VI.    The Aggrieved Individuals

150.    Beginning no later than March 2012 and continuing through the present, aggrieved individuals like Divine received conditional job offers from JBS Carriers.

151.    Beginning no later than March 2012 and continuing through the present, JBS Carriers has required all job applicants who received conditional job offers to complete ErgoMed's post-offer screen before they could begin employment as truck drivers.

152. Beginning no later than March 2012 and continuing through the present, ErgoMed has communicated with JBS Carriers regarding the post-offer screen results of each job applicant, including the aggrieved individuals.

153. Beginning no later than March 2012 and continuing through the present, ErgoMed's communications with JBS Carriers regarding the post-offer screen results of job applicants, including the aggrieved individuals, have included a recommendation on whether the applicant should be hired.

154. Beginning no later than March 2012 and continuing through the present, ErgoMed's communications with JBS Carriers regarding the post-offer screen results of job applicants, including the aggrieved individuals, have included a "Post Offer Screen/Fit for Duty" report.

155. Beginning no later than March 2012 and continuing through the present, JBS Carriers has withdrawn its offers of employment to any applicant who did not successfully complete the post-offer screen.

156. As a result of ErgoMed's post-offer screen, including communications from ErgoMed to JBS Carriers, JBS Carriers learned about the medical histories of job applicants, including the aggrieved individuals.

157. As a result of ErgoMed's post-offer screen, including communications from ErgoMed to JBS Carriers, JBS learned about perceived medical impairment(s) of certain aggrieved individuals.

158. As a result of ErgoMed's post-offer screen, including communications from ErgoMed to JBS Carriers, JBS Carriers learned of certain aggrieved individuals' impairments.

159.    As a result of ErgoMed's post-offer screen, including communications from ErgoMed to JBS Carriers, JBS Carriers learned of certain aggrieved individuals' history of having impairments.

160.    Because they did not successfully complete the post-offer screen, ErgoMed sent JBS Carriers "No Job Match" recommendations for each of the aggrieved individuals.

161.    ErgoMed also sent JBS Carriers "Post Offer Screen/Fit for Duty" reports for each of the aggrieved individuals.

162.    If the aggrieved individuals attempted to complete the physical abilities testing, ErgoMed sent JBS Carriers the results of that testing.

163.    JBS Carriers withdrew conditional job offers from the aggrieved individuals.

164.    JBS Carriers did not hire the aggrieved individuals.

165.    JBS Carriers denied employment to the aggrieved individuals because they were unable or not allowed to complete the post-offer screen.

166.    JBS Carriers denied employment to the aggrieved individuals based on ErgoMed's "No Job Match" recommendations.

167.    JBS Carriers did not discuss with the aggrieved individuals whether they needed reasonable accommodation to complete the post-offer screen.

168.    JBS Carriers did not discuss with the aggrieved individuals whether they were able to perform the essential functions of the truck driving position, with or without reasonable accommodation.

169.   JBS Carriers did not make individualized assessments as to whether the aggrieved individuals needed reasonable accommodation to complete the post-offer screen.

170.   JBS Carriers did not make individualized assessments as to whether the aggrieved individuals could perform the essential functions of the truck driving position, with or without reasonable accommodation.

171.   JBS Carriers continued to accept applications from other applicants for truck driver positions after it denied employment to each of the aggrieved individuals.

172.   JBS Carriers hired other applicants into truck driving positions after it denied employment to each of the aggrieved individuals, including Divine.

**FIRST CLAIM FOR RELIEF – Failure to Hire Because of Disability**
**(42 U.S.C. 12112(a))**

173.   The EEOC reasserts and incorporates by reference all of the foregoing allegations.

174.   At all relevant times, Divine and the other aggrieved individuals were individuals with disabilities under 42 U.S.C. § 12102.

175.   At all relevant times, Divine and the other aggrieved individuals were qualified and able to perform the essential functions of the truck driving position(s) they were offered at JBS Carriers, with or without reasonable accommodation.

176.   JBS Carriers, through its relationship with ErgoMed, learned of the medical impairment(s) or the physical limitation(s) of Divine and other aggrieved individuals.

177.   JBS Carriers regarded Divine and other aggrieved individuals as disabled.

178.   JBS Carriers, through its relationship with ErgoMed, discovered that certain aggrieved individuals had records of impairment(s) that substantially limited one or more major life activities.

179.   JBS Carriers, through its relationship with ErgoMed, discovered that certain aggrieved individuals had impairment(s) that substantially limited one or more major life activities.

180.   JBS Carriers violated the ADA by refusing to hire Divine and other aggrieved individuals because it regarded these individuals as disabled, because these individuals had records of disabilities, because these individuals had disabilities, and/or because of the need to accommodate these individuals.

181.   JBS Carriers violated the ADA by engaging in a pattern or practice of refusing to hire job applicants because it regarded such applicants as disabled, because the applicants had records of disabilities, because the applicants had disabilities, and/or because of the need to accommodate such applicants.

182.   The circumstances of JBS Carriers's use of ErgoMed's post-offer screen and JBS Carriers's decisions not to hire Divine and the other aggrieved individuals give rise to an inference that they were not hired based on their disability, impairment(s), record of disability or impairment(s), or perceived disability.

183.   By engaging in this discriminatory practice, JBS Carriers sought, to the greatest extent possible, to eliminate employees with disabilities from its workforce and to evade its obligation under the ADA to provide reasonable accommodation to job applicants and employees.

184.    The effect of JBS Carriers's unlawful employment practices has been to deprive Divine and a class of qualified aggrieved individuals with disabilities of equal employment opportunities and otherwise affect their status as applicants for employment because of their disabilities.

185.    The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Divine and the other aggrieved individuals and to deprive Divine and the other aggrieved individuals of the financial and other benefits of working for JBS Carriers.

186.    The unlawful employment practices complained of in the foregoing paragraphs above were, and are, intentional.

187.    The unlawful employment practices complained of in the foregoing paragraphs were, and are, done with malice or with reckless indifference to the federally protected rights of Divine and other qualified aggrieved individuals with disabilities.

188.    On information and belief, the unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**SECOND CLAIM FOR RELIEF – Use of Standards, Criteria, or Methods of Administration that Have the Effect of Discrimination on the Basis of Disability (42 U.S.C. § 12112(a) and (b)(3))**

189.    The EEOC reasserts and incorporates by reference all of the foregoing allegations.

190.    JBS Carriers used ErgoMed's post-offer screen to deny hire to Divine and to other qualified individuals with disabilities.

191.    At all relevant times, JBS Carriers would not and did not hire applicants who did not complete ErgoMed's post-offer screen.

192.    At all relevant times, JBS Carriers would not and did not hire applicants who received "No Job Match" recommendations from ErgoMed.

193.    JBS Carriers's use of ErgoMed's post-offer screen had the effect of discriminating on the basis of disability, in violation of 42 U.S.C. § 12112(a) and 12112(b)(3).

194.    The effect of JBS Carriers's use of ErgoMed's post-offer screen has been to deprive Divine and a class of qualified individuals with disabilities of equal employment opportunities and otherwise affect their status as applicants for employment because of their disabilities.

195.    The unlawful employment practices complained of in the foregoing paragraphs above were and are intentional.

196.    The unlawful employment practices complained of in the foregoing paragraphs were, and are, done with malice or with reckless indifference to the federally protected rights of Divine and other qualified aggrieved individuals with disabilities.

197.    On information and belief, the employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**THIRD CLAIM FOR RELIEF – Use of Qualification Standards or Other Selection Criteria that Screens Out or Tend to Screen Out Individuals with Disabilities (42 U.S.C. §§ 12112(a) and (b)(6))**

198.    The EEOC reasserts and incorporates by reference all of the foregoing allegations.

199.    JBS Carriers used ErgoMed's post-offer screen to screen out or tend to screen out Divine and other aggrieved individuals with disabilities.

200.   At all relevant times, JBS Carriers engaged in a pattern or practice of using ErgoMed's post-offer screen to screen out or tend to screen out and deny hire to qualified individuals with disabilities.

201.   At all relevant times, JBS Carriers would not and did not hire applicants who did not complete ErgoMed's post-offer screen.

202.   At all relevant times, JBS Carriers would not and did not hire applicants who received "No Job Match" recommendations from ErgoMed.

203.   JBS Carriers's use of ErgoMed's post-offer screen screens out, or tends to screen out, individuals with disabilities in violation of Section 102(b)(6) of the ADA, 42 U.S.C. § 12112(b)(6).

204.   The effect of JBS Carriers's use of ErgoMed's post-offer screen has been to deprive Divine and a class of aggrieved individuals with disabilities of equal employment opportunities and otherwise affect their status as applicants for employment because of their disabilities.

205.   The unlawful employment practices complained of in the foregoing paragraphs above were, and are, intentional.

206.   The unlawful employment practices complained of in the foregoing paragraphs were, and are, done with malice or with reckless indifference to the federally protected rights of Divine and other qualified aggrieved individuals with disabilities.

207.   On information and belief, the unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**FOURTH CLAIM FOR RELIEF – Improper Use of Medical Information**
**(42 U.S.C. § 12112(d)(3))**

208.    The EEOC reasserts and incorporates by reference all of the foregoing allegations.

209.    JBS Carriers, though its relationship with ErgoMed, obtained medical information regarding Divine and the other aggrieved individuals.

210.    JBS Carriers improperly used this medical information to deprive Divine and the other aggrieved individuals of equal opportunities under 42 U.S.C. §§ 12112(a), (b)(3), (b)(5)(A), and (b)(6).

211.    JBS Carriers improperly used this medical information to commit violations otherwise alleged in this Complaint and/or in violation of Section 102(d)(3) of the ADA, 42 U.S.C. § 12112(d)(3).

212.    JBS Carriers engaged in a pattern or practice of using this medical information to deprive individuals of equal opportunities under 42 U.S.C. §§ 12112(a), (b)(3), (b)(5)(A), and (b)(6), and to commit violations otherwise alleged in this Complaint and/or in violation of Section 102(d)(3) of the ADA, 42 U.S.C. § 12112(d)(3).

213.    The effect of JBS Carriers's unlawful employment practices has been to deprive Divine and a class of qualified aggrieved individuals with disabilities of equal employment opportunities and otherwise affect their status as applicants for employment because of their disabilities.

214.    The unlawful employment practices complained of in the foregoing paragraphs above are intentional.

215.    The unlawful employment practices complained of in the foregoing paragraphs were, and are, done with malice or with reckless indifference to the federally protected rights of Divine and other qualified aggrieved individuals with disabilities.

216.    On information and belief, the unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

**FIFTH CLAIM FOR RELIEF - Failure to Provide Reasonable Accommodations (42 U.S.C. § 12112(b)(5)(A))**

217.    The EEOC reasserts and incorporates by reference all of the foregoing allegations.

218.    Certain aggrieved individuals had records of impairment(s) that substantially limited one or more major life activities.

219.    Certain aggrieved individuals had impairment(s) that substantially limited one or more major life activities.

220.    These aggrieved individuals were qualified to perform the essential functions of the truck driving position they were offered by JBS Carriers, with or without reasonable accommodation.

221.    JBS Carriers had an obligation to engage in the interactive process to determine whether one or more reasonable accommodations were available to these individuals.

222.    JBS Carriers failed to perform individualized assessments as to whether these aggrieved individuals were capable of performing the essential functions of the truck driving positions, with or without reasonable accommodation

223.    At no time did JBS Carriers engage in the interactive process with these aggrieved individuals.

224.    At no time did JBS Carriers provide these aggrieved individuals with reasonable accommodations.

225.    By refusing to provide these aggrieved individuals with reasonable accommodations, JBS Carriers violated Sections 102(a) and 102(b)(5)(A) of Title I of the ADA, 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A).

226.    The effect of the practices complained of in the foregoing paragraphs above has been to deprive qualified individuals with disabilities of equal employment opportunities and otherwise adversely affect their status as applicants for employment because of their disabilities.

227.    The unlawful employment practices complained of in the foregoing paragraphs above were, and are, intentional.

228.    The unlawful employment practices complained of in the foregoing paragraphs were, and are, done with malice or with reckless indifference to the federally protected rights of Divine and other qualified aggrieved individuals with disabilities.

229.    On information and belief, the unlawful employment practices complained of in the foregoing paragraphs are continuous and ongoing.

## PRAYER FOR RELIEF

Wherefore, the EEOC respectfully requests that this Court:

A.    Grant a permanent injunction enjoining JBS Carriers, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from utilizing a post-offer screen that screens out individuals with disabilities or has the effect of discriminating against individuals with disabilities, from improperly using

medical information, from refusing to hire individuals with disabilities, and from refusing to provide reasonable accommodations to individuals with disabilities.

B.     Order JBS Carriers to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities and eradicate the effects of its past and present unlawful employment practices.

C.     Order JBS Carriers to make whole Divine and other aggrieved individuals, by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

D.     Order JBS Carriers to make whole Divine and other aggrieved individuals by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in the foregoing paragraphs above, in amounts to be determined at trial.

E.     Order JBS Carriers to pay Divine and other aggrieved individuals punitive damages for its malicious and reckless conduct, as described in the foregoing paragraphs above, in amounts to be determined at trial.

F.     Enter appropriate declaratory relief.

G.     Grant such further relief as the Court deems necessary and proper in the public interest.

H.     Award the EEOC its costs of this action.

## JURY TRIAL DEMAND

The EEOC requests a jury trial on all questions of fact raised by its complaint.

James Lee
Acting General Counsel

Gwendolyn Reams
Associate General Counsel

Mary Jo O'Neill
Regional Attorney
Phoenix District Office

Rita Byrnes Kittle
Senior Supervisory Trial Attorney

*s/ Laurie Jaeckel*
Lauren Jaeckel
Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
303 E. 17th Avenue, Suite 410
Denver, CO 80203
Phone: (303)-866-1381
Email: lauren.jaeckel@eeoc.gov